Filed 7/6/16  P. v. Camacho CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JORGE CAMACHO,<br><br>        Defendant and Appellant. | A132875<br><br>(Contra Costa County<br>  Super. Ct. No. 50809012) |

After a jury trial defendant was convicted of the following substantive offenses with true findings made on the sentence enhancement allegations:  (1) first-degree murder of Luis Perez, with related gang, firearm, and multiple-murder special circumstances allegations (count 1); (2) first-degree murder of Lisa Thayer, with related gang, firearm, and multiple-murder special circumstances allegations (count 6); (3) first degree murder of Rico McIntosh, with a related gang allegation (count 5); (4) conspiracy to commit murder and assault with a deadly weapon, with a related gang allegation (count 2); and (5) participation in a criminal street gang (count 3).  (Pen. Code,[1] §§ 182, subd. (a)(1); 182.5; 186.22, subd. (b)(1)), and (2); 187, subd. (a); 190.2, subds. (a)(3) and (22); 12022.53.)[2]  The court sentenced defendant to two consecutive terms of life in prison without the possibility of parole (count 1 - Perez murder and count 6 - Thayer murder),

---

[1]    All further unspecified statutory references are to the Penal Code.

[2]    The jury acquitted defendant of a charge of first-degree murder of Antonio Centron, with a related gang enhancement (count four).

1

plus an aggregate term of 95 years to life consisting of consecutive terms of (1) 25 years to life (count 5 – McIntosh murder); (2) 25 years to life (firearm use enhancement) and 10 years (gang enhancement) related to count 1; and (3) 25 years to life (firearm use enhancement) and 10 years (gang enhancement) related to count 6. The court imposed either concurrent terms or stayed sentences on the remaining counts and related gang enhancement.

On appeal defendant presents various arguments challenging his convictions and sentences. We find no merit to his claims, except for one sentencing error. We agree with the parties that the trial court erred in imposing consecutive determinate ten-year terms for the gang enhancements related to the first-degree murder convictions with special circumstances under counts 1 and 6. We shall remand the matter to the trial court to modify the sentences accordingly. In all other respects, we affirm the judgment.

<h1 style="text-align:center">FACTS[3]</h1>

## A.    Prosecution's Case in Chief

The prosecution's theory of liability was that 13 actively-engaged members of the Varrio Frontero Loco (VFL), a Sureno criminal street gang, whose territory was the City of Richmond (Richmond), had entered into a conspiracy to "bring back the hood" to gain increased respect for the gang, by, among other things, committing murders and assaults against rival Norteno gang members in their territory of the City of San Pablo (San Pablo)[4]. Defendant was alleged to be a conspiratorial gang member of the VFL.[5]

---

[3]    The evidentiary portion of the trial was presented from April 19, 2011 to May 16, 2011. It included the testimony of over 40 witnesses and the reading of portions of witnesses' testimony elicited at grand jury proceedings and earlier VFL gang prosecution trials as well as the admission of over 200 exhibits. In this fact section, we present a basic background of the evidence, generally viewed in the light most favorable to upholding the verdicts. In the discussion section, we present additional facts necessary to resolve defendant's appellate contentions.

[4]    San Pablo is completely surrounded by Richmond.

[5]    The indictment filed against defendant named as alleged co-conspirators: Cole Azamar (Azamar), Luis Hernandez (Hernandez), Hector Molina-Betances (Molina), Francisco Romero, Jorge Sanchez (Sanchez), Jose Martinez, Frank Rubalcava, Fernando

2

Although not every member of the conspiracy was present at each crime, the prosecution's theory was that each co-conspirator was liable for the acts, both intended and reasonably foreseeable, of his co-conspirators. The "net result of this conspiracy" was the death of several people, including Luis Perez, Lisa Thayer, and Rico McIntosh.

1. **Conspiracy to Commit Murder and Assault with a Deadly Weapon (Count 2) and Participation in a Criminal Street Gang (Count 3)**

To demonstrate that defendant was an active participant in the VFL gang, and had conspired with other gang members to commit murders and assaults with a deadly weapon, the prosecution presented, in pertinent part, the sworn testimony and out-of-court statements of VFL gang members Sanchez[6] and Ruelas[7] and Mexican Locos (ML) gang member and VFL associate gang member Victor Cervantes (Cervantes)[8].

The VFL and ML gangs were Richmond Sureno gangs. The rivals of the Surenos were members of the Norteno gang, whose territory was primarily in the Broadway area

Garcia, Jose Mota-Avendano (Mota), Larry Valencia, Javier Gomez (Gomez), and Gamaliel Elizalde (Elizalde). All of the named co-conspirators were alleged members of the VFL gang, except for Gomez, an alleged member of the Mexican Locos gang, a Sureno gang that associated with the VFL gang. The indictment also included charges of murder, conspiracy, participation in a criminal street gang, against Azamar and Hernandez, who are not parties to this appeal.

[6] By the time of the trial, Sanchez was 23 years old, and had been out of the VFL gang for three years.

[7] Before defendant's trial, Ruelas had been placed in a witness protection program and was given money to move to Las Vegas and Redding. By the time of defendant's trial, Ruelas had violated his witness protection agreement and he was "kicked out" of witness protection and informed that the District Attorney's office could no longer help him. Ruelas did not testify at defendant's trial. The jury heard audio-tapes of his statements to the police and approximately six hours of a video-taped conditional examination. The prosecutor and defense counsel also read to the jury portions of Ruelas' testimony that was elicited at grand jury proceedings and earlier VFL gang prosecution trials.

[8] Cervantes testified that in exchange for his testimony, he got a "six years suspended state prison [sentence] and a strike on [his] record" for an "assault with a deadly weapon in Richmond in 2007." Cervantes claimed he had assaulted Nortenos who were throwing rocks at his car. By the time of the trial, Cervantes was in protective custody because he had received calls from persons threatening his life.

3

of San Pablo. The VFL gang relied on violence to create fear and respect and to control its territory. When Ruelas was recruited in 2001 or 2002, he was told by then VFL leader Victor Valencia and his younger brother Jose Valencia, that the gang "need[ed] some people like [Ruelas] to bring the hood back." Ruelas was expected to "do whatever to make the hood come up," including "shootings, robbing, drug dealing, all kinds of stuff." Ruelas worked his way up the gang hierarchy by shooting and beating rival Norteno gang members. When gang members had nothing to do or were bored, they would drive around San Pablo, "just go looking for people to kill, basically." In addition to San Pablo, VFL gang members could find Nortenos to shoot and kill, in "Montalvin, Pinole, De Anza, everywhere. Everywhere except in Richmond." Ruelas testified that before defendant became a member of the VFL, defendant rode along with gang members and if someone had to be shot, defendant would get out of the car and ask to shoot the person to earn respect. According to Ruelas, defendant "got caught up with one of our guns at a store, so he went to Byron" Boys ranch for nine months. After defendant came out, he got jumped into the VFL gang, according to Ruelas.

Sanchez testified that when he started in the VFL he had heard of defendant but did not know him because defendant was "in juvenile hall or the ranch." Sanchez did not meet or ever see defendant until "jail." However, Sanchez spoke with Mota and Ruelas about defendant's participation in the VFL. When asked, "Where was [defendant's] position supposed to be in the conspiracy," Sanchez replied that defendant was "in the regular VFL," "just . . . doing his own thing on the side," "always in the ranch or . . . just riding along with different people," "just stealing cars," and "attacking rival gang members," which was "part of being VFL." According to Sanchez, defendant was not considered a lower gang member, but the same as Sanchez, Ruelas and Azamar. Ruelas confirmed that defendant was "in there with, like the main heads of VFL, was [sic] me, Richie, and this dude named Sleepy [Azamar], VFL."

In mid-2007, VFL gang leader Victor Valencia shot a member of the "Richmond Sur Trece" (RST), a separate City of Richmond Sureno gang. Victor Valencia fled to

4

Mexico and later died there.[9] The VFL gang was in turmoil because there was no acknowledged leader and gang members feared retaliation from RST gang members. At this time Sanchez considered himself jumped out of the VFL gang and he was trying to lay low and stay away from the VFL gang. When Elizalde became the gang leader, he contacted Sanchez and told him he was still in the VFL gang. Elizalde told other gang members that they "needed to bring the gang back [and] . . . put them on top." Elizalde's plan was to first recruit new people and then start taking them to the streets, "start being violent, shootouts, drive-bys," and attacking Norteno gang members, to improve the reputation of the VFL. Elizalde's plan to attack rival gang members, sell more drugs, and obtain more guns, was organized by a "little council" of five gang members: Sanchez, Azamar, Hernandez, Mota, and Ruelas, who were supposed to "run" their own people. At the same time, the VFL gang had a close relationship with the ML gang, an "upcoming" Sureno gang, but there was a split in the ML leadership and some of their members "were running with [VFL], when we went to do drive-bys or something like that they were with [the VFL]. . . ."

Victor Cervantes testified he had previously been a member of the ML gang. In late 2007 and early 2008, after there was an internal split in the ML gang, Cervantes was accepted as an associate VFL gang member. Cervantes knew defendant, having seen him hanging around with VFL gang member Molina. According to Cervantes, in late 2007 and early 2008, the VFL and ML gangs were planning to come back up and get their names back up on the street and expand recruiting members by "just going to get most of the Nortenos out of Richmond and San Pablo by whooping them, making them get out of there. Killing them [or] whatever it takes to get them out of there."

---

[9] After gang members heard of Victor Valencia's death, a funeral for him was held in Richmond. The funeral service was attended by several alleged VFL gang members or associates including defendant, Sanchez, Elizalde, Molina, Romero, Azamar, Hernandez, Gomez, Mota, Avendano, Menendez, and Ruelas.

### 2.     Murder of Luis Perez (Count 1)

To demonstrate defendant's participation in the murder of Luis Perez, charged as a substantive offense (count 1) and an overt act of the conspiracy alleged in count 2, the prosecution presented the sworn testimony and out of court statements of Larry Valencia[10] and Azamar[11], as well as evidence of the police investigation of the murder.

On the evening of February 16, 2008, defendant and five other alleged VFL members or associates (Mota, Azamar, Hernandez, Molina, Larry Valencia), were socializing at a house in North Richmond. They smoked marijuana and drank "booze," and defendant was also "popping pills," and was "hella fuckin' high." At the suggestion of defendant, the men drove to San Pablo in two cars; defendant and Molina were passengers in Mota's car and Larry Valencia and Hernandez were passengers in Azamar's car. At 2:15 a.m., Mota's car stopped near Luis Perez, who was standing on the street. Perez did not belong to a gang, but he was wearing a red sweatshirt. Exiting Mota's car, defendant told Perez, "show me your hands, you're all dressed in red." Perez responded by saying, "what the fuck," twice. Defendant fired seven shots at close range. Two shots entered the victim's back in a downward direction fatally wounding Perez. Defendant got back into Mota's car and all the men in the two cars went back to Richmond. Perez's neighbor and her boyfriend did not see who shot Perez; they heard the argument, followed by gunshots, and then the sound of cars driving away.

---

[10]     Larry Valencia testified under a grant of use immunity. He had initially been charged with murder but the charge was dropped. He had not received any consideration from the prosecution in return for his testimony, and he was not appearing in court as part of a plea bargain. The court advised the jury that it was taking judicial notice of the court's records that a preliminary hearing was held where Larry Valencia was charged with murder and at the conclusion of a preliminary examination the judge who heard the evidence did not hold him to answer on the charge of murder and the charge was dropped.

[11]     Azamar, an admitted VFL gang member, testified that in exchange for his testimony at defendant's trial, the prosecution agreed to reduce the charges against him from murder to accessory after the fact, and he was sentenced to a five year probationary term he was then serving.

Larry Valencia testified he had never been a VFL gang member, but admitted he knew gang members including his cousin and defendant. In the past Larry Valencia had heard VFL gang members brag about beating up rival gang members and he knew the Broadway area of San Pablo was Norteno gang territory. Additionally, during a police search of Larry Valencia's home after the Perez murder, the police found gang indicia including blue bandanas, blue hats, music CD's with gang writing and photographs of persons making Sureno gang signs.

As to the circumstances of the Perez murder, Larry Valencia testified that on the night in question he was in the backseat of a car when he heard "gunshots." Larry Valencia did not actually see the face of the shooter, but he was sure defendant was the shooter because, unlike the other men in Mota's car, the shooter, like defendant, was short in stature, had long hair, and was wearing a hoody. Larry Valencia saw no gun, but he saw flames coming out of the gun that defendant "was holding up and shooting with." After the shooting Larry Valencia panicked; he had never seen "anything like this," and he did not know that anyone was carrying a gun that evening. As soon as the cars arrived back in Richmond, Larry Valencia got into his car and went home. The police arrested Larry Valencia on May 14, 2008. Larry Valencia told the police that defendant had shot the man wearing red. At a grand jury hearing and an earlier jury trial, Larry Valencia testified consistently with his statements to the police.

Azamar, an admitted VFL gang member, also testified as to circumstances of the Perez murder. On the night in question, Azamar and the other men with him including defendant were just driving around, hoping to find girls at a party. As Azamar sat in the driver's seat of his car, Azamar saw defendant get out of Mota's car and argue with Perez, who was wearing red. Acting totally surprised, Perez held up both arms, and Molina said, "Get him!" Defendant pulled a gun from his waist and fired at Perez. Perez fell at the first shot. Larry Valencia was screaming that he wanted to go home, and Azamar told him to "[s]top being a bitch." Azamar took Larry Valencia to his car and Larry Valencia drove away. Azamar denied knowing that any of the men had a gun that night and he did not expect to see anyone get shot. Following his arrest, Azamar was

7

placed in the jail's Q module with other VFL gang members. According to Azamar, while VFL gang members were housed in jail, defendant was "calling the shots, . . . telling [Azamar] what to do in jail, . . . [and] getting the kites [inner jail mail]." On one occasion Azamar got into a fight with defendant and Azamar lost. Later, Azamar made arrangements to talk with the police.

During the investigation of the Perez murder scene, the police found nine 9-millimeter Luger cartridge casings on the ground, mostly within three to five feet of Perez's body. The police also recovered a spent bullet with blood on top of the victim's red sweatshirt, which had been cut off by the paramedics and left at the scene.

### 3.    Murder of Lisa Thayer (Count 6)

To demonstrate defendant's participation in the murder of Lisa Thayer, charged as a substantive offense (count 6) and an overt act of the conspiracy alleged in count 2, the prosecution's evidence consisted principally of the testimony of several witnesses who saw or heard shots fired but did not see the actual shooting or identify the shooter; audio recordings of three police interviews and portions of the trial testimony of Antonio S. (Antonio) [12] elicited at an earlier VFL gang prosecution trial on November 15, 2010 [13]; and the testimony of police officers who investigated the murder and a forensic pathologist.

On the afternoon of February 27, 2008, in San Pablo, several people witnessed a gun fight between several men in a van and a shooter on the street (the shooter) who was with two or three other men. The shooter, armed with a chrome, semi-automatic pistol, fired several shots in the direction of the men in a van. The shooter was not identified; he was described as approximately 18 or 19 years old, Hispanic or Mexican, approximately

---

[12]    At defendant's trial, Antonio was called as a witness but he refused to testify even under a grant of use immunity. After a hearing, the court found Antonio in contempt of court and ordered him held in custody until the conclusion of the trial or he agreed to testify. Despite being given the opportunity to do so, Antonio never agreed to testify during the trial. The court ordered Antonio's release at the conclusion of the trial.

[13]    Defense counsel also read to the jury portions of Antonio's trial testimony elicited at the earlier VFL gang prosecution trial on November 15, 2010.

8

five foot seven, approximately 180 pounds, having long black hair worn in a ponytail. The men in the van drove away and the men on the street ran away. Lisa Thayer, who was not a member of a gang, was found nearby on the street. Based on the position of Thayer's body and the various descriptions of the shooting, the police believed that as the van drove away the shooter fired a 9-millimeter bullet, which missed the fleeing van and hit Thayer, fatally wounding her.

Immediately after Thayer was shot, San Pablo police officers received a dispatch reporting that a person had called saying that "some kids were shot at and then jumped . . . [or] ran into this apartment complex." When law enforcement arrived at the apartment complex, the investigating police officers spoke with a witness, who had heard gunshots and fifteen minutes later, observed two young men running into the apartment complex. The witness further explained that the young men went to an apartment for a few minutes, and then fled toward the laundry room area of the apartment complex. As the police were interviewing the witness, they spotted two young men, matching the witness's descriptions, running in the apartment complex. The two young men, later identified as defendant and Antonio, were caught and arrested by the police officers. As the police secured defendant, he was asked if he had any items on his person and he produced a blue bandana. The police later searched defendant's home. In defendant's bedroom, the police found an empty case for .40 caliber handgun, an empty .40 caliber magazine, and a holster that would fit a 9-millimeter pistol, but no guns. The police also found gang drawings and gang graffiti on paper on which was written "Sur," which was an abbreviation for Sureno, and the number 13 in between a cross.

During the investigation of the Thayer murder scene, the police found nine 9-millimeter bullets within a ten-foot circle around Thayer's body. The location of the bullets was consistent with a person firing a weapon while standing in place, and not someone who was running and firing a weapon at the same time. The police also found .40 caliber shells and an unfired .38 caliber bullet in a cul-de-sac through which defendant and Antonio had run while fleeing from the men in the van. The gun that fired the bullet that killed Thayer was never recovered. However, a comparison of the 9-

9

millimeter cartridge casings recovered from the Thayer and Perez murder scenes established that the casings were fired from the same 9-millimeter pistol.

Over the course of three interviews with the police, Antonio described the basic events of the day of the shooting. According to Antonio, defendant belonged to the VFL gang but Antonio did not. Antonio and defendant were walking on San Pablo Avenue near a liquor store when three men inside a burgundy van looked out and "mean mugged" them and then the van stopped. There were two Mexicans or Hispanics and an African-American man in the van. One of the men in the van got out and started shooting at Antonio and defendant. The man fired five or six shots as Antonio and defendant ran down the street passing a strip mall with a salon and toward an apartment complex. The van driver turned the van around and followed Antonio and defendant, and as defendant and Antonio jumped over a fence into an apartment complex, the men in the van began shooting at them again.

During the interviews with the police, Antonio was questioned about the individuals who fired shots during the incident. During the first interview, Antonio claimed the men in the van fired on defendant and Antonio, and neither Antonio nor defendant fired back at any time. During the second interview, Antonio claimed the men in the van initially started shooting. Not knowing that defendant had a gun, Antonio was shocked when defendant pulled out a chrome gun and fired back five or six times at the men in the van. Antonio explained that during his initial interview he did not tell the police that defendant fired a gun because Antonio did not want to get defendant in trouble. When the men in the van shot at them a second time, defendant and Antonio were near an apartment complex and defendant did not shoot at the men in the van. During the third police interview, Antonio stated he did not know if defendant had fired his gun before or after the men in the van had first started shooting at them.

At an earlier VFL gang prosecution trial, Antonio testified that on the afternoon of the Thayer shooting, he and defendant went to a store on San Pablo Avenue to pick up Antonio's gold-tooth dental grill. The men left the shop and as they were walking on the sidewalk, a van passed the men and pulled over and stopped. The men in the van

"mugged" Antonio and defendant. Antonio and defendant kept on walking and after that Antonio heard gunshots, which Antonio guessed were fired by the men in the van. After the shots were fired, Antonio and defendant ran between a construction site, ended up at a dead end street, and jumped over a fence into an apartment complex. As Antonio and defendant jumped the fence, the van came around the corner and the men in the van started shooting again but did not hit Antonio or defendant. Once Antonio and defendant got to the apartment complex, they sat on the stairs and did not go into anyone's house. When the police came, Antonio and defendant left the apartment complex and the police chased after them. Antonio further testified that after the police discussed with him the concept of self-defense, he made up a story about defendant firing his gun because he believed he was helping defendant make it look like self defense. However, Antonio did not realize that "the whole time" he was incriminating defendant.

On April 24, 2008, the police received information about defendant's involvement in the Thayer shooting from Ruelas, who was then acting as a police informant. According to Ruelas, defendant told him that on the day in question he had two guns. Defendant had gone to get his gold-tooth dental grill, and when he came out of the store, defendant saw "the Nortenos on the corner or something." Defendant "started talking shit to 'em. They didn't say nothing. He said, 'Man, these mother fuckers some suckers.' [Defendant] pulled out the guns. He said he started shooting at 'em. And he started running. And there was some black dude wit' him." Defendant also said he gave his guns to "some dude name Nacho," who was a ML gang member. When asked why defendant would give a gun to a ML gang member, Ruelas replied that the MLs wanted to run with the VFL. Defendant told Nacho to sell the guns, but Ruelas did not know if Nacho had sold the guns.[14]

---

[14] During cross-examination at his conditional examination, Ruelas testified he had told the grand jury that he had talked to defendant about "a murder charge" defendant "was facing" [the Thayer incident], and defendant had said "that he was shooting back at some dude[s] because the dudes were shooting back at him," and defendant did not know that he had shot a lady until afterwards when the cops told him. However, on redirect examination, Ruelas said that "[e]verybody knew th[e] story" that he had told the police

11

### 4. Murder of Rico McIntosh (Count 5)

To demonstrate defendant's participation as a co-conspirator[15] in the murder of Rico McIntosh, charged as a substantive offense (count 5) and an overt act of the conspiracy as alleged in count 2, the prosecution's evidence consisted of the testimony of Oscar Menendez[16], as well as evidence acquired during the police investigation of the murder.

Menendez testified he became involved with VFL gang members when he was 21 years old. He attended parties at the invitation of the VFL gang members, and there were some parties attended by people from other gangs, including the MLs. Menendez explained his understanding of the activities of a gang member. On one occasion defendant told him that to gain respect from the gang, a member had to commit a certain number of crimes and keep the Nortenos "on check so they can respect you," which meant to beat them up. Menendez knew the Surenos were rivals of the Nortenos, and that the Nortenos' territory was San Pablo especially on Broadway and Montalvin. He understood that when you were in the gang, you were supposed to hunt Nortenos in the Broadway area of San Pablo. Menendez also understood that every time a VFL gang member saw a Norteno out of Richmond he was to "[b]eat him up" "[a]nd if you had a gun use that against them."

On the night of the McIntosh shooting, Mota and Gomez picked up Menendez to "hang out" together. Mota was driving his new black car, Gomez sat in the front passenger seat and Menendez sat in the back seat. The men were supposed to go to McDonald's, but instead of making a right turn, Mota made a left turn heading toward

about defendant's involvement in the Thayer shooting, and Ruelas asserted he had made up the story and had never spoken with the defendant about any murder.

[15] On February 27, 2008, defendant was arrested for the Thayer murder. He was still in custody on the day of the McIntosh murder.

[16] Menendez testified he had pleaded guilty to being an accessory after the fact to the murder of McIntosh with a related gang enhancement, he agreed to spend time in county jail, and he received some assistance with his immigration issues. He had also agreed to testify truthfully if called to testify as a witness in defendant's trial.

Broadway in San Pablo. As Mota was driving, the men saw McIntosh walking on the sidewalk closest to the passenger side of the car; McIntosh was wearing "kind of some red," the color claimed by Nortenos. Gomez said to the men in the car that he had observed McIntosh coming from a party being held at a Norteno house. Mota and Gomez rolled down the car windows and asked McIntosh if he was a buster. McIntosh said, "What the fuck is a buster?" Mota then said, "Yeah, he is," and Gomez pulled out a gun and shot McIntosh about five times. According to Menendez, McIntosh was "a white guy" and did not look like a Norteno gang member. After the shooting Mota and Gomez asked Menendez why he was so scared, and Menendez said he wanted to go home. The men dropped Menendez at his home; they were acting happy and making fun of Menendez.

Menendez denied that he, Mota, and Gomez, had ever been out looking for people to shoot before the night of the McIntosh shooting. On the night of the McIntosh murder Menendez did not know that Gomez was armed until he pulled out a gun and shot McIntosh. [17] After the McIntosh shooting, Gomez asked Menendez to hold the gun because Gomez was on parole. Menendez said, "No," but when the men dropped Menendez at his home they just left the gun and Menendez took the gun and hid it in a cabinet in his room. During a later search of Menendez's house, the police found a .25-caliber semi-automatic inside a cabinet. A ballistics analysis showed that the shell casings found at the scene of the McIntosh shooting were fired from the gun recovered from Menendez's residence. The police found no evidence that McIntosh was a gang member.

After his arrest Menendez was placed in a jail module with VFL gang members including defendant and Molina. In jail, Menendez was informed that there were certain

---

[17] Menendez testified he had previously found the gun and gave it to Mota because Ruelas said he (Menendez) did not know how to use a gun. On the night of the McIntosh murder, Mota gave the gun to Gomez who used it to shoot McIntosh.

rules that VFL gang members had to follow while in jail.[18]  Both Molina and defendant asked Menendez to turn over his paperwork (police report of his arrest) but Menendez could not do so because his father had the document.  The day he was asked for his paperwork Menendez was beaten by defendant and another VFL gang member while the men were returning to their module after a free period.  Menendez was then placed in protective custody.

San Pablo Police Detective Robert Brady confirmed that on the day McIntosh was killed, Ruelas was working as a confidential informant for the police.  Ruelas told Brady that Mota, Gomez, and Menendez, were driving around the San Pablo area, specifically the Broadway area and several other areas, hunting for Nortenos, they found a subject, and they shot him.  After the McIntosh murder, Brady participated in a search of Gomez's home.  Inside Gomez's room, the police located several CDs and CD cases with Sureno gang references written on them, a few notebooks with rap lyrics written inside, and a couple of blue bandanas.  One of the CDs had written on it the monikers of certain gang members and "VFLs, MLs."

B.      Defense Case

Defendant called as a witness gang expert Martin Sanchez-Jankowski, who identified three models of criminal street gang structures.  The witness testified that Mexican-American street gangs typically fit into the "influential model," where charismatic members within the structure are respected leaders.  The witness further testified that gangs generally are hierarchical and the notion that gangs are "loose associations with little in the way of a cohesive leadership structure is simply not accurate."  The witness confirmed that collective or organized attacks on rival gangs helped build cohesion, tended to increase gang membership by improving the gang's reputation, and was a method by which a gang rebuilt itself.  Individual gang members gained status and moved up the organization by committing violent acts.  However, there

---

[18]     Sanchez explained that it was common for gang members to look over "paperwork," i.e. police reports of gang members, to ascertain whether the gang members were cooperating with the police.

14

was "a difference between violence, committed by a gang member that could be committed any time, at any place, and gang violence which was an organizational violence that was directed by the leadership of the organization for the benefit of the organization." The looser the structure of the gang, the more likely that violence would be the independent act of individual gang members.

Defendant's sister testified that defendant had been kicked out of the family residence when he was 15 years old because he was too rebellious. The witness thought that defendant's father was too strict with defendant. Defendant hung around with cousins who were gang members and got into trouble. However, the witness did not believe defendant was in a gang; he never carried a blue rag and he never possessed a gun.

## C. Prosecution's Rebuttal

The prosecution recalled Detective Brady, qualified as an expert on the Norteno and Sureno gangs, who testified about the history of the Sureno gang and its common signs and symbols, and that the VFL and ML were gang subsets of the Sureno criminal street gang. Brady opined defendant was a member of the VFL gang for the following reasons: (1) defendant self-admitted to investigators during this case to being a VFL gang member; (2) defendant was carrying a blue bandana in his pocket at the time he was arrested; (3) defendant was identified as a gang member by VFL informants; and (4) defendant had "[g]one into classifications, identified himself as being a VFL." Detective Brady also opined that Sanchez, Menendez, Azamar, and Ruelas, were VFL gang members; Larry Valencia was a VFL gang "associate," and Cervantes was a ML gang member. Based on hypotheticals of the circumstances of the Perez, Thayer, and McIntosh murders, Detective Brady opined that such offenses were committed for the benefit of, in furtherance of, and in association with the VFL gang.

## D. Jury Verdicts

Defendant was convicted of the following substantive crimes with true findings made on the sentence enhancements: (1) the first-degree murder of Luis Perez, with related gang, firearm, and multiple-murder special circumstances allegations (count 1) ;

15

(2) the first-degree murder of Lisa Thayer, with related gang, firearm, and multiple-murder special circumstances allegation (count 6); (3) first-degree murder of Rico McIntosh, with a related gang allegation (count 5); (4) conspiracy to commit murder and assault with a deadly weapon, with a related gang allegation (count 2); and (5) participation in a criminal street gang (count 3).

## DISCUSSION

**I.      Convictions for Conspiracy to Commit Murder and Assault with a Deadly Weapon (Count 2) and Participation in a Criminal Street Gang (Count 3)**

Defendant seeks reversal of his convictions for conspiracy to commit murder and assault with a deadly weapon (count 2) and participation in a criminal street gang (count 3), on the ground that the trial court's accomplice instructions " 'impliedly and erroneously authorized the jury to find' " five police informants – Cervantes, Menendez, Ruelas, Azamar, and Larry Valencia – were not accomplices, " 'thereby making corroboration [of their testimony] unnecessary.' " We conclude defendant's claim of instructional error is both forfeited and unavailing.

Initially, we conclude defendant has forfeited his claim of error regarding the accomplice instructions. Some of the CALJIC accomplice instructions ultimately given to the jury were listed among defense counsel's proposed jury instructions submitted to the court prior to trial. Thereafter, defense counsel lodged no objection to the court's accomplice instructions proposed and ultimately given to the jury. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 [" '[g]enerally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].)

Even if defendant's failure to object in the trial court did not forfeit his claim of error in the accomplice instructions, we see no basis for reversal on this ground. The law is well settled that "[w]hether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom." (*People v. Garrison* (1989) 47 Cal.3d 746, 772 (*Garrison*), citing to *People v. Rodriguez*

16

(1986) 42 Cal.3d 730, 758-759; *People v. Tewksbury* (1976) 15 Cal.3d 953, 960 (*Tewksbury*); see *People v. Sully* (1991) 53 Cal.3d 1195, 1227-1228 (*Sully*).)  The trial court here advised the jury as to the definition of an accomplice (CALJIC No. 3.10 [Accomplice-Defined]) and the requirements regarding the jury's consideration of such testimony (CALJIC Nos. 3.11 [Testimony of Accomplice or Codefendant Must Be Corroborated], 3.12 [Sufficiency of Evidence to Corroborate An Accomplice], 3.13 [One Accomplice May Not Corroborate Another], 3.14 [Criminal Intent Necessary to Make One An Accomplice] and 3.18 [Testimony of Accomplice To Be Viewed With Care And Caution]).  The jury was also instructed that "[i]f the crime of murder was committed by anyone, Jorge Sanchez was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration."  (CALJIC No. 3.16 [Witness Accomplice As Matter of Law].)  The jurors were then instructed that they were to determine if Cervantes, Menendez, Ruelas, Azamar, and Larry Valencia, were also accomplices and that defendant bore the burden of proving by a preponderance of the evidence whether those witnesses were accomplices.  (CALJIC No. 3.19 [Burden To Prove Corroborating Witness Is An Accomplice].)  Consequently, as defendant concedes, if the jury determined the five witnesses were not accomplices, their testimony or out-of-court statements would not need to be corroborated by independent evidence or viewed with caution.

In addressing defendant's challenge to the accomplice instructions, we see no merit to his arguments that (1) Azamar and Larry Valencia were accomplices as a matter of law because they were initially named as co-conspirators in the indictment filed against defendant, and (2) Menendez, Cervantes, and Ruelas, were accomplices as a matter of law because the prosecutor claimed that those witnesses were co-conspirators. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 431 (*Bryant*) [the fact that a witness was initially charged with the same crimes as defendant "did not establish as a matter of law that he was an accomplice"]; *Garrison, supra,* 47 Cal.3d at p. 772 ["[t]he fact that a witness has been held to answer for the same crimes as the defendant and then granted immunity does not necessarily establish that he or she is an

17

accomplice"]; see also *Tewksbury, supra,* 15 Cal.3d at p. 960 ["[t]he fact that 'the witness was prosecuted for the same offense as defendant does not alone establish her to be an accomplice [as a matter of law],' " quoting *People v. Gordon* (1973) 10 Cal.3d 460, 467].)

Moreover, the record establishes the status of the five witnesses as accomplices to the conspiracy (count 2) and participation in a criminal street gang (count 3) was a contested factual issue at the trial: (1) Larry Valencia denied ever being a VFL gang member. He testified that he did not know that anyone was carrying a gun on the night of the Perez murder. (2) Azamar testified that he had been a VFL gang member for seven years, but he never shot or killed anyone. He also denied that there was a plan to look for Nortenos or shoot anyone or that he had ever gone with fellow VFL gang members to Broadway or Montalvin to attack Nortenos. Azamar further testified that he did not know that any of the men had a gun and he did not expect to see anyone get shot on the night of the Perez murder. (3) Menendez disavowed membership in the VFL gang, asserting he had never been jumped in as a gang member. Before the McIntosh murder Menendez had never been out with Mota and Gomez looking for people to shoot, and, on a prior occasion when driving with Mota, Menendez had stopped Mota from shooting a man wearing red and believed to be a Norteno gang member. On the night of the McIntosh murder, Menendez had no prior knowledge that either Gomez or Mota were armed and were going to shoot McIntosh or any Norteno gang member. (4) Cervantes, an admitted VFL associate gang member, denied he had ever entered into an agreement with any gang to kill people. He claimed that his only activity with VFL gang members consisted of giving VFL gang member Molina a ride home after Molina had gotten out of jail in December 2007. (5) Ruelas disavowed membership in the VFL gang, claiming he was "just a wannabe," denied that he had ever attacked Nortenos or shot at anyone, and asserted that in his statements to the police and when he previously testified at grand jury proceedings and two separate VFL gang prosecution trials he had either lied or exaggerated his knowledge and defendant's participation in the VFL gang. During his conditional examination and at a prior VFL gang prosecution trial, Ruelas also testified

18

that he had been deported to Mexico in 2007, he did not have any contact with members of the VFL while he was in Mexico, and he did not return to the United States until March 2, 2008, and the next day he became a police informant. Thus, absent a finding that the testimony of the five witnesses was inherently incredible, "[t]he trial court could not have instructed that [the witnesses were accomplices] as a matter of law without offering to the jury the court's belief that the witness[es] had given false testimony. Accordingly, the question was a factual one properly submitted to the jury." (*Garrison*, *supra*, 47 Cal.3d at p. 772; see *People v. Hayes* (1999) 21 Cal.4th 1211, 1272 (*Hayes*) [trial court did not err in determining that a witness was not an accomplice as a matter of law where jury could give credence to witness's denial that she knew of defendant's intent to kill].) [19]

Even assuming the jurors found all five witnesses to be accomplices, and considering the court's instruction that Sanchez was an accomplice as a matter of law whose testimony had to be corroborated, we conclude there was sufficient corroborating evidence of defendant's commission of the criminal conduct alleged in counts 2 and 3. "[T]he existence of a conspiracy may be proved by uncorroborated accomplice testimony; corroboration of accomplice testimony is needed only to connect the defendant to the conspiracy." (*People v. Price* (1991) 1 Cal.4th 324, 444 (*Price*); see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134, 1135 [accord] (*Rodrigues*).) Corroborating evidence connecting a defendant with a crime is sufficient, even if "slight, . . .entirely circumstantial, and . . . [not] sufficient to establish every element of the

---

[19] Defendant's reliance on *People v. Robinson* (1964) 61 Cal.2d 373 (*Robinson*) is misplaced as that case is factually inapposite. In *Robinson*, a witness had made an extrajudicial confession, the truth of which he admitted at trial, that he had planned the robbery during which a victim was killed. (61 Cal.2d at pp. 380-381, 394.) Our Supreme Court held that under those specific circumstances, the witness' testimony made him an accomplice as a matter of law and therefore the trial court erred in failing to instruct the jury that the witness was an accomplice and his testimony had to be corroborated. (61 Cal.2d at p. 394.) Unlike the situation in *Robinson*, in this case we do not have extrajudicial confessions or judicial confessions from any of the witnesses making them accomplices as a matter of law.

19

charged offense." (*Hayes, supra*, 21 Cal.4th at p. 1271, citing to *People v. Frye* (1998) 18 Cal.4th 894, 966, and *People v. Zapien* (1993) 4 Cal.4th 929, 982.) Here, contrary to defendant's contention, the jury reasonably could infer defendant's participation in the conspiracy alleged in count 2 and participation in a criminal street gang alleged in count 3, based on (1) the testimony of Sanchez, Cervantes, Menendez, Azamar, Ruelas, and Larry Valencia, standing alone, which "provided prima facie evidence" of the conspiracies (*Rodrigues, supra*, at p. 1128), coupled with (2) the independent evidence of defendant's commission of overt acts of the murders of Perez and Thayer, including defendant's participation in the Thayer murder (audio recordings of Antonio's three police interviews and portions of the trial testimony of Antonio elicited at an earlier VFL gang prosecution trial on November 15, 2010), the discovery of an empty holster that would fit a 9-millimeter pistol found in defendant's bedroom after the Thayer shooting, and evidence that a comparison of the 9-millimeter cartridge casings recovered from the Thayer murder scene and from the earlier Perez murder scene established that those casings were fired from the same 9-millimeter pistol.

Thus, we find no basis to reverse the convictions for conspiracy to commit murder and assault with a deadly weapon (count 2) and participation in a criminal street gang (count 3) on the grounds asserted by defendant.

## II.     Conviction for the McIntosh Murder (Count 5)

Defendant challenges his conviction for the McIntosh murder on several grounds, none of which requires reversal.

Defendant first argues his conviction for the McIntosh murder was based on the uncorroborated accomplice testimony of co-conspirators Menendez and Ruelas. However, as we have previously concluded, the accomplice status of Menendez and Ruelas as co-conspirators was a factual issue properly submitted to the jury. Because the jury reasonably could find that the witnesses were not accomplices, under the appropriately given instructions, we need not, and do not decide, whether there was sufficient corroborating evidence. (*Bryant, supra*, 60 Cal.4th at p. 432.)

Defendant also argues his conviction for the McIntosh murder should be reversed because that murder was not committed in furtherance of the conspiracy alleged in count 2. Relying on isolated portions of the trial evidence and the prosecutor's closing remarks, defendant specifically contends the scope of the conspiracy as alleged in count 2 was "never more" than an agreement by VFL gang members to "take back the hood" by committing crimes against rival Nortenos in Richmond only, and therefore, the alleged conspiracy did not encompass the Mctosh murder, which took place in San Pablo. However, consistent with the evidence provided by Sanchez and Cervantes,[20] the jury reasonably could find that the scope of the conspiracy to "take back the hood" in late 2007 and early 2008 was an agreement among VFL gang members to regain street respect for the gang by the commission of violent acts in the area claimed as Sureno territory within Richmond and the shooting and beating of rival Norteno gang members in Richmond as well as their claimed gang territory of San Pablo. The portions of the evidence mentioned by defendant in support of his appellate argument were "submitted to the jury [and] w[ere] apparently disbelieved by them. The jurors were entitled to base their verdict upon the reasonable inferences to be drawn from the testimony offered by the prosecution and were not bound to accept the evidence [relied on] by the defense in opposition to such inferences." (*People v. Thomas* (1933) 135 Cal.App. 654, 659 (*Thomas*).) Additionally, the prosecutor, in his closing remarks, did not limit the scope of the conspiracy to "an agreement to 'take back the hood' in *Richmond* from rival Nortenos," as defendant argues. Instead, the prosecutor expressly urged the jury to

---

[20]    According to Sanchez, when Elizalde became the VFL gang leader, Elizalde contacted Sanchez and told him he was still in the VFL gang. Elizalde told other gang members that they "needed to bring the gang back [and] . . . put them [on] top." Elizalde's plan was to first recruit new people and then start taking them to the streets, "start being violent, shootouts, drive-bys," and attacking Norteno gang members, to improve the reputation of the VFL. According to Cervantes, in late 2007 and early 2008, the VFL and ML gangs were planning to come back up and get their names back up on the street and expand recruiting members by "just going to get most of the Nortenos out of Richmond and San Pablo by whooping them, making them get out of there. Killing them [or] whatever it takes to get them out of there."

21

consider the charge of conspiracy as alleged in count 2 in the following manner: "So let's talk about why the defendant is guilty of conspiracy . . . . The adoption by a person of the criminal design and criminal intent entertained in common by others, and of its object and purposes, is all that is necessary to make that person a co-conspirator. [¶] So, . . . [O]bviously, there is no direct evidence that the defendant sat down with Gama or somebody else and said, hey, what are we doing, oh, we are bringing the hood back. What does that mean, we are going to attack rivals. There is none of that. [¶] . . . [¶] *The defendant on February 16th, 2008, clearly showed that he had adopted the design of the conspiracy. He went hunting in rival gang territory. And he killed Luis Perez. Just according to the plan of the conspiracy, which is to attack rival gang members in their territory*. [¶] The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. [¶] . . . [O]nce you decide that a defendant is a conspirator, his fellow co-conspirators, all of these guys, their acts, . . . the acts of Scrappy, Gomez, Mota when they killed Rico McIntosh, despite the fact that the defendant wasn't there, those are his acts, because they have occurred in furtherance of the common design of the conspiracy. [¶] It is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement. The formation of a conspiracy may be inferred from all circumstances tending to show the common intent, either by direct or circumstantial evidence." (Italics added.)

Nor do we see any merit to defendant's contention that his conviction for the McIntosh murder should be reversed because that murder was not a reasonably foreseeable consequence of the conspiracy alleged in count 2. Again relying on isolated portions of the trial testimony, defendant contends the McIntosh murder, committed while he was incarcerated, was an independent spur of the moment act committed by Mota, an alleged member of the VFL gang, and Gomez, the actual shooter, who was a member of the ML gang, and not a VFL gang member. However, both Mota and Gomez were named as alleged co-conspirators in the indictment filed against defendant. At the time of the conspiracy alleged in count 2, the VFL gang had a close relationship with the ML gang, an "upcoming" Sureno gang, but there was a split in the ML leadership, and,

22

therefore, according to Sanchez, some of the ML gang members "were running with [VFL], when we went to do drive-bys or something like that they were with [the VFL]. . . . Sanchez further claimed that Gomez "put in work" for the VFL gang and "should have been a VFL" gang member. Consequently, the jury reasonably could find that Gomez was a member of the ML gang but sufficiently identified as a member of the VFL gang so as to be considered a VFL gang member and a member of the conspiracy alleged in count 2. The portions of the evidence mentioned by defendant in support of his appellate argument were "submitted to the jury [and] w[ere] apparently disbelieved by them. The jurors were entitled to base their verdict upon the reasonable inferences to be drawn from the testimony offered by the prosecution and were not bound to accept the evidence [relied on] by the defense in opposition to such inferences." (*Thomas, supra,* 135 Cal.App. at p. 659.) Additionally, the trial court explicitly and appropriately advised the jurors that they were to decide the scope of the conspiracy and the duration and the goals of the conspiracy. "[H]ow far the subsequent conduct of defendant[ ] went to establish a conspiracy, and to what extent [he was] involved in it, whe[re and when] that conspiracy had its origin . . . ; whether the crime alleged was committed in pursuance of the conspiracy found to have been formed, or was the act of some of the persons present, done 'as a fresh and independent product of the minds of some of them, and outside of and foreign to the common design,' were questions exclusively with the jury." (*People v. Holmes* (1897) 118 Cal. 444, 457.)

We also reject defendant's argument that the trial court violated his due process rights by allowing the jury to convict him of the McIntosh murder based on "an invalid conspiracy theory of vicarious liability." According to defendant, California law does not allow for conspiracy as a valid theory of vicarious criminal liability. However, he concedes our Supreme Court has consistently rejected his argument, and upheld convictions based on a defendant's vicarious liability for the acts of a co-conspirator. (See *People v. Valdez* (2012) 55 Cal.4th 82, 149-150 (*Valdez*), and the cases cited therein; see also *People v. Maciel* (2013) 57 Cal.4th 482, 515 (*Maciel*); *People v. Lopez* (2013) 56 Cal.4th 1028, 1071, disapproved on another ground in *People v. Rangel* (2016)

23

62 Cal.4th 1192, 1215-1216.) We see no reason to further address defendant's contention, especially in light of the fact that we are bound by the decisions of our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455).

### III. Admission of Jorge Sanchez's Testimony about Defendant's Activities as VFL Gang Member

Defendant argues the trial court committed prejudicial error by admitting Sanchez's testimony concerning conversations the witness had with VFL gang members about defendant's activities as a VFL gang member. Our review of the record leads us to conclude otherwise.

#### A. Relevant Facts

During the trial, the prosecutor sought to question Sanchez about his discussions with Ruelas and Mota regarding defendant's activities as a VFL gang member. The prosecutor asked Sanchez "[a]nd what role . . . was Camacho playing," according to Ruelas and Mota, "who are supposed to be generals" in the VFL. Defense counsel objected on the ground that the response would be hearsay. The prosecutor replied that the question sought to elicit "statements in furtherance of the conspiracy." Defense counsel argued, however, that there was no foundation for the admission of a co-conspirator's statement because Sanchez did not know and had never met defendant. Sanchez was just "hearing things" about defendant; "[s]o it's not in furtherance of a conspiracy at that time, because there had not been any planning with respect to [defendant]." The court overruled the objection, ruling that "co-conspirators need not know each or all of the other co-conspirators for them to be members of a conspiracy or for them to be co-conspirator statements. [¶] In order for it to be clear that the foundation has been for the existence of a conspiracy, at least among the generals, Mr. Elizalde and so forth, as to Mr. Camacho's connection with the conspiracy I'm going to admit the statements subject to tying up with evidence of Mr. Camacho's participation, but I think the existence of a conspiracy has been at least adequately established to lay the foundation. [¶] The jurors will be deciding whether the conspiracy is proven or not, and whether the statements are in furtherance of the conspiracy when each of the relevant

24

participants is a member of the conspiracy, but for purposes of foundation . . . of the co-conspirator exception I do find that an adequate foundation has been laid subject to tying up the defendant's role."

The prosecutor then elicited the following testimony: Sanchez testified defendant's position "in the conspiracy" "was just in the regular VFL." It was understood amongst Sanchez and his "fellow VFLs," Ruelas, "Sleepy," and Mota, that defendant "was out doing things that the VFL did, including attacking rival gang members," as that was what you had to do if you were in the gang; "that is part of what you have to do. That is part of being VFL." When asked if defendant was considered a lower member than Sanchez, Ruelas, and Sleepy, Sanchez replied, "I don't think so. He was known as a down ass homie, so not on the lowest level, but the same as us." When asked what "down ass homie" meant, Sanchez replied, "That's when you quit work, you ain't scared to get down and fight, whatever you have to do."

**B.     Analysis**

As noted, the trial court allowed Sanchez's quoted testimony pursuant to Evidence Code section 1223, which reads: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) or (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

Defendant argues that at the time Sanchez's testimony was proffered, no evidence had been introduced from which the trial court could properly find that Sanchez's statements had been made (1) while Sanchez was participating in the conspiracy and in furtherance of its objective, and (2) prior to or during the time defendant was participating in that conspiracy. However, the records supports the trial court's finding that there was a sufficient foundation for the admission of the testimony "subject to"

25

admission of evidence that Sanchez's statements about defendant were made prior to and during the time defendant was participating in that conspiracy. If defendant believed the prosecutor failed to later meet the burden of demonstrating defendant's connection to the conspiracy at the time of Sanchez's discussions with other co-conspirators, then defense counsel should have made a specific objection on that ground and sought to have the testimony stricken. Having failed to make an appropriate objection, we cannot conclude the trial court erred in allowing the testimony on the ground now asserted on appeal. "[A]s the testimony was admitted conditionally, and as the defendant failed to move to strike it out on the ground that the promised connection of the testimony had not been made, any possible error in its admission must be deemed [forfeited]." (*People v. Balmain* (1911) 16 Cal.App. 28, 32.)

In all events, we conclude any purported error in the admission of the testimony was not prejudicial. Sanchez's testimony concerning defendant's activities as a VFL gang member was cumulative of Ruelas' testimony to the same effect. As we have discussed, the jury could reasonably find Ruelas was not an accomplice as a co-conspirator and therefore his testimony did not need corroboration. Consequently, we conclude the admission of Sanchez's testimony was harmless under any standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

## IV.     Admission of Evidence of Defendant's 2006 Arrest for Gun Possession

### A.     Relevant Facts

Over defendant's objection, the trial court allowed into evidence testimony regarding defendant's 2006 arrest for possession of a loaded gun. Richmond Police Detective Christopher Llamas testified that on December 20, 2006, he followed defendant into a liquor store, detected an odor of marijuana from his person, searched him there, found a loaded .38 caliber revolver in the pocket of his sweatshirt, and arrested him. After defendant was read his *Miranda* rights, and waived them, Llamas asked defendant whether he belonged to a gang. Defendant said he was a VFL.

26

After the jury heard Officer Llamas' testimony, the trial court allowed defense counsel to state, for the record, a discussion held between the court and counsel at a side-bar conference before the officer's in-court testimony. At the sidebar the parties argued as to whether the evidence should have been admitted. The trial court believed that the evidence was admissible to show that defendant was a member of the VFL gang when he was arrested in 2006, which was direct evidence of defendant's state of mind, his intent or desire to be a member of the VFL. The court further found that defendant's possession of the gun while being a claimed member of the VFL was direct evidence of defendant's participation in the conspiracy in 2006, "early on and well before any of the homicides."

**B.     Analysis**

The trial court admitted Detective Llama's testimony of defendant's 2006 arrest pursuant to Evidence Code section 1101, subdivision (b), which provides for the "admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absent of mistake or accident . . .) other than his or her disposition to commit such an act." (*Ibid.*) In challenging the trial court's ruling, defendant makes two complaints: (1) the court improperly commented that the other-crimes evidence showed defendant's involvement in the conspiracy in 2006 although the alleged conspiracy did not exist at that time; and (2) the court improperly relied on Ruelas' grand jury testimony that the gun possessed by defendant belonged to the VFL gang when the record failed to establish Ruelas had personal knowledge of the ownership of the gun. As we now discuss, defendant's contentions do not require reversal.

At the outset we conclude defendant's claim of error is forfeited as he made no objection to the trial court's ruling on the two grounds he now asserts on appeal. "Under California law, error in admitting evidence may not be the basis for reversing a judgment or setting aside a verdict unless 'an objection to or a motion to exclude or to strike the evidence . . . was timely made and *so stated as to make clear the specific ground of the objection or motion*.' (Evid. Code, § 353, subd. (a), italics added.) 'In accordance with this statute, [our Supreme Court has] consistently held that the "defendant's failure to

27

make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. [Citation.]' (*People v. Seijas* (2005) 36 Cal.4th 291, 302 [30 Cal.Rptr.3d 493, 114 P.3d 742].)" (*People v. Zamudio* (2008) 43 Cal.4th 327, 354.)

In all events, even if the other-crimes evidence of defendant's 2006 arrest should not have been admitted, defendant has failed to demonstrate prejudice. We find as did the trial court that any prejudicial effect of the other-crimes evidence was "relatively low" . . . as it "was no stronger and no more inflammatory than the [evidence] concerning the charged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) Moreover, the verdicts, including defendant's acquittal for the Centron murder, demonstrates that the jury did not focus on the other-crimes evidence to the exclusion of other evidence. It is highly unlikely the jury doubted that defendant committed the charged offenses but convicted him based on a belief that he had been arrested for possession of a gun in 2006. (*People v. Carpenter* (1997) 15 Cal.4th 312, 380.) On this record, we can be reasonably certain that the other-crimes evidence and the prosecutor's remarks regarding that evidence "could not have affected the jury's verdicts" under any standard of review. (*People v. Earp* (1999) 20 Cal.4th 826, 858; see *Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 836.) Nor do we see any merit to defendant's conclusory argument that "the erroneous admission of [the other-crimes] evidence coupled with the court's instruction on its permissible use violated [his] federal and state constitutional rights to due process by lightening the prosecution's burden of proof." Accordingly, defendant's claim of reversible error on this ground fails.

## V. Admission of Defendant's Statement of Gang Membership

### A. Relevant Facts

In support of the prosecution's theory that defendant was a VFL gang member, the prosecutor called as a witness Deputy Sheriff Thomas Trindade, an intake officer at the Martinez Detention Facility. Without objection, Deputy Sheriff Trindade testified he spoke with the defendant after his arrest and detention in jail on December 27, 2007. Deputy Sheriff Trindade asked defendant if he was affiliated with a gang, and defendant replied, "he was a Sureno." Deputy Sheriff Trindade also testified regarding his duties as

28

an intake officer and the reason for questioning detainees regarding any gang affiliations. He explained that detainees were asked about their gang affiliations "for safety and security" so that a self-proclaimed gang member would be housed separately from members of another gang. As an intake officer, Deputy Sheriff Trindade did not typically deal with or concern himself with whether a detainee was a member or an associate of a gang. He just asked whether or not the detainee had any gang affiliations. If the detainee said he was a member of the Sureno gang, Deputy Sheriff Trindade assumed the detainee was a gang member and housed the detainee accordingly. Members of different gangs were placed in separate holding cells until they were interviewed by a classification officer.

## B.     Analysis

On appeal, defendant argues the trial court erred in admitting Deputy Sheriff Trindade's testimony because there was no evidence that defendant was given *Miranda* warnings before the officer questioned defendant about his gang affiliation. Defendant concedes his trial counsel did not object to Deputy Sheriff Trindade's testimony, but argues that his claim of error is cognizable on direct appeal because there can be no valid strategic reason why counsel would not have objected to the evidence. He further asserts his trial counsel's failure to object was prejudicial because his admission of gang membership "was certainly the prosecution's strongest evidence on the issue, and thoroughly disabled the defense from making any argument to the contrary." According to defendant, had the evidence been objected to and excluded, there is a reasonable probability that at least some of the jury's findings in this case would have been different and more favorable to him. We conclude defendant's arguments are unavailing.

As defendant concedes, his trial counsel failed to object to the admission of any portion of Deputy Sheriff Trindade's testimony. Consequently, we do not know what the witness would have said had he been asked if defendant had been informed and waived his *Miranda* rights before responding to the question about gang affiliation. Because the record does not show whether or not defendant was advised of his *Miranda* rights before he admitted being a Sureno gang member, defendant's claim of ineffective assistance of

29

counsel cannot be resolved on this appeal.  As an appellate court we cannot declare that Deputy Sheriff Trindade acted improperly when he questioned defendant, find that it was error for the trial court to admit the evidence, "and brand a defense attorney incompetent unless [we] can be truly confident all the relevant facts have been developed and [Deputy Sheriff Trindade] and [the] prosecution had a full opportunity to defend the admissibility of the evidence." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.)  " 'When . . . the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons. . . .  Because the appellate record . . . does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should . . . be made in a petition for writ of habeas corpus, not on appeal.' (*People v. Diaz* (1992) 3 Cal.4th 495, 557, 558.)" (*People v. Lucero* (2000) 23 Cal.4th 692, 728-729.)  Even if Deputy Sheriff Trindade's testimony of defendant's admission of gang membership was elicited in violation of *Miranda*, as we more fully explain below, we would conclude on this record that defendant has failed to meet his burden of demonstrating prejudice under any standard of review.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694; *Chapman, supra,* 386 U.S. at p. 24; *Watson, supra*, 46 Cal.2d at p. 838.)

"In *Pennsylvania v. Muniz* (1990) 496 U.S. 582 [110 L.Ed.2d 528, 110 S. Ct. 2638, 110 L.Ed.2d 528] (*Muniz*), the plurality opinion recognized a ' "routine booking question" exception which exempts from *Miranda*'s coverage questions to secure the "biographical data necessary to complete booking or pretrial services." ' (*Muniz,* at p. 601 (plur. opn. of Brennan, J.).)  Quoting an amicus curiae brief, the plurality noted: ' "recognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception.  Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." ' (*Muniz,* at p. 602, fn. 14.) [¶] A concurring and dissenting opinion in *Muniz*, joined by four justices, presumed the validity of the ' "booking exception." ' (*Muniz, supra*, 496 U.S. at p. 607

(conc. & dis. opn. of Rehnquist, C.J.).)" (*People v. Williams* (2013) 56 Cal.4th 165, 187.) Thus, *Miranda*'s "booking exception" is now well-recognized law. (*Ibid.*)

In *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*), our Supreme Court was faced with the issue of whether *Miranda*'s "well-recognized booking exception" extended to "routine questions about gang affiliation, posed to [a] defendant while processing him into jail on murder charges." (*Id.* at p. 527.) The court initially found "it is permissible to *ask* arrestees questions about gang affiliation during the booking process. Jail officials have an important institutional interest in minimizing the potential for violence within the jail population and particularly among rival gangs, which ' "spawn a climate of tension, violence and coercion." [Citation.]' (*Florence v. Board of Chosen Freeholders of County of Burlington* (2012) [566] U.S. __, __ [132 S. Ct. 1510, 1518].)" (*Elizalde, supra*, at p. 541.) The court went on to hold that the defendant's answers to unadmonished gang questions posed in that case were inadmissible in the prosecution's case-in-chief. (*Ibid.*) Nonetheless, the erroneous admission of the testimony was subject to harmless error analysis under *Chapman, supra,* 386 U.S. 18, and the court found the prosecution in that case had met its burden of proving beyond a reasonable doubt that the erroneous evidentiary ruling did not contribute to the verdict. (*Elizalde, supra*, at p. 542.)

In this case, we similarly conclude that even if Deputy Sheriff Trindade's testimony regarding defendant's admission of gang affiliation was erroneously admitted into evidence, there was no prejudicial error under *Chapman, supra*, 386 U.S. 18. The record reflects that defendant's "gang affiliation was amply established by independent and uncontradicted evidence" from Sanchez, Ruelas, Antonio, and Menendez, who all testified they knew defendant to be a VFL gang member at the relevant times. (*Elizalde, supra*, 61 Cal.4th at p. 542.) Even if the jurors found that Ruelas and Menendez were accomplices, together with Sanchez, who was deemed to be an accomplice as a matter of law, their testimony and out of court statements were adequately corroborated by the testimony of San Pablo Police Detective Robert Brady, an expert on Norteno and Sureno criminal street gangs. (*Id.* at p. 542.) Brady opined that defendant was a VFL gang

member, based on, among other things, defendant's association with other VFL gang members, identifications by gang member informants, and the fact that defendant was carrying a blue bandana when he was arrested in February 2008. The jury could also consider as corroborating evidence the testimony of the police that gang drawings and graffiti and notebooks with the notations of "Sur" and "13," were found in defendant's residence after his arrest on February 28, 2008. Accordingly, if the issue was properly before us, we would conclude defendant's claim of prejudicial error on this ground fails.

## VI.  CALJIC No. 2.11.5 – Unjoined Perpetrators of the Same Crimes

Defendant presents several arguments challenging the trial court's use of CALJIC No. 2.11.5, none of which requires reversal.

### A.  Relevant Facts

CALJIC No. 2.11.5 was listed among defense counsel's proposed jury instructions submitted to the court prior to trial. Without objection by defense counsel, the court instructed the jury using CALJIC No. 2.11.5, in the following manner: "There has been evidence in this case that a person or persons other than the defendant was or may have been involved in the crime for which that [sic] defendant is on trial. [¶] There may be many reasons why those persons are not here on trial. Therefore, do not speculate or guess as to why the other persons are not being prosecuted in this trial or whether they have been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendant on trial."

### B.  Analysis

We conclude defendant has forfeited appellate review of his contention that the trial court should have omitted CALJIC No. 2.11.5. in its entirety. At no time did defense counsel object to the use of CALJIC No. 2.11.5. In all events, the instruction was properly given in this case. In addition to the six witnesses mentioned in the accomplice instructions (Sanchez, Larry Valencia, Azamar, Menendez, Cervantes, and Ruelas), the jury heard testimony concerning other participants in the crimes charged against defendant. Thus, the court appropriately admonished the jury not to consider whether other participants had been or would be prosecuted in separate proceedings.

32

We also conclude defendant has forfeited appellate review of his related claim that at a minimum the trial court should have modified CALJIC No. 2.11.5 to expressly limit the instruction to persons who did not testify at trial and exclude from its application the testimony of Sanchez, Larry Valencia, Azamar, Menendez, Cervantes, and Ruelas. "[W]here, as here, the instruction is properly given as to some unjoined perpetrators but not as to others, a defendant who fails to ask the trial court to give a limiting instruction may not raise the issue on appeal." (*Valdez, supra,* 55 Cal.4th at p. 149, citing to *Sully, supra*, 53 Cal.3d at p. 1218.) Defendant's claim that CALJIC No. 2.11.5 should have been modified also fails on the merits. The six witnesses (Sanchez, Cervantes, Ruelas, Azamar, Larry Valencia, Menendez) were questioned concerning the status of any charges filed against them and any agreements they might have made with the prosecution. Thus, defendant correctly concedes the jury did not have to speculate as to why the six witnesses were not joined as co-defendants at his trial. Defendant argues, however, that neither CALJIC No. 2.11.5 nor the instructions concerning accomplice testimony directed, or even suggested, that in evaluating the credibility of each of the witnesses "the jury should consider the fact that the witness's testimony . . . was the *quid pro quo* of his not being prosecuted for those crimes." We disagree. In addition to CALJIC No. 2.11.5 and the accomplice instructions given in this case, the trial court gave "other standard witness credibility instructions, including CALJIC No. 2.20, which informed the jurors to keep in mind the existence of any 'bias, interest, or other motive' on the part of a witness." (*Valdez, supra*, 55 Cal.4th at p. 149.) "The jury was also told to consider the instructions as a whole in accordance with CALJIC No. 1.01. (*Sully, supra*, 53 Cal.3d at pp. 1218-1219.) Consequently, as our Supreme Court explained in *Valdez,* "in connection with substantially identical facts, when a trial court gives CALJIC No. 2.11.5 'with the full panoply of witness credibility and accomplice instructions, as it was in this case,' reasonable jurors will understand that although they may not consider 'the separate prosecution or nonprosecution of coparticipants, and the reasons therefor,' they may consider 'a plea bargain or grant of immunity . . . as evidence of interest or bias in assessing the credibility of prosecution witnesses. [Citation.]' " (*Valdez, supra*, 55

33

Cal.4th at p. 149; see *Maciel*, *supra*, 57 Cal.4th at pp. 538-539 [court rejected defendant's contention that CALJIC No. 2.11.5 "should have been 'limited to exclude those accomplices who testified under a grant of immunity' "].)

Lastly, we reject defendant's contention that CALJIC No. 2.11.5, as given, was prejudicial because "[t]he number of prosecution witnesses who fell within the ambit of the instruction – six – was simply too high, and the quantity and importance of their evidence to the prosecution case simply too great."  " 'When reviewing a supposedly ambiguous [i.e., potentially misleading] jury instruction, " 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' (*People v. Welch* [(1999)] 20 Cal.4th 701, 766.)" (*People v. Ayala* (2000) 24 Cal.4th 243, 289.)  "[T]his record gives no indication of a reasonable likelihood that the jury applied the instructions given it in a legally improper manner." (*Id*. at p. 290.)  "When the challenged instruction is considered in light of the entire charge, we are persuaded a reasonable juror would not have understood it as precluding the jury from considering the [various agreements the prosecution made with the six witnesses] in assessing the credibility of those witnesses." (*Price, supra,* 1 Cal.4th at p. 446.)  Although the instruction should have been clarified, "we cannot agree that giving it amounted to error in this case." (*Ibid*.; see *Valdez, supra*, 55 Cal.4th at p. 149 [accord].)

## VII.   Prosecutorial Misconduct

Defendant argues that reversal is required because certain remarks made by the prosecutor during his rebuttal closing argument impugned the integrity of defendant's trial counsel.  We conclude the argument is not preserved for appellate review and, in all events, lacks merit.

### A.      Relevant Facts

During his summation defense counsel commented on the prosecutor's opening closing remarks in the following manner:  "My colleague, my young colleague, who has got good computer skills, has repeated those parts of the Judge's instructions, which favor him, you know, set them up dramatically, kind of like a good beer ad or something.

I mean, very, very, well done presentation, use of media, bombarding us with comparisons and arrows and so that we get this impression. [¶] . . . [I]t's a good technique and it works in selling products, and we know that. Otherwise, companies wouldn't do it, but in law we – we should rationally consider things. You have to trust the Judge's instructions, not the views that you get from the lawyers. [¶] And, first of all, they are not excerpted and cut in pieces to make a certain point. They are balanced. The Court's instructions are balanced. They will give you an instruction that goes one way, and then the defense way, they give you a balanced view, not a cut and paste, you know, set of excerpts. And that is important that we do that. We are trying to make rational decisions." Defense counsel also discussed certain police officers' conduct during their interviews with certain gang members, arguing that Detective Brady was "sarcastic and angry" at the end of one of the interviews, that other officers lied and pressured, using "a bad cop, good cop routine," to get certain gang members to make statements, and "so there are police actions that have been affecting the truth in this case, affecting testimony. Use of ruses. . . . phony videos and things like that."

In rebuttal, the prosecutor addressed defense counsel's comments in the following manner (italicized language is challenged on appeal): "I never have been or had the presentation of the law referred to as the pitching of beer ads before. That is – that is something new. [¶] Let me tell you first and foremost, ladies and gentleman, the law that I presented you with I not only gave you the law, jury instruction number, its referenced in the packet that you use, that you will have, I gave you the jury instruction number and I quoted the law. [¶] One of the jobs that I have as a prosecutor representing the People of the State of California is to tell you what the law is and help you understand it. I guess from what the defense wanted me to do they would have preferred that I read the entire packet to you again. [¶] . . . If I was presenting the law in an inappropriate or improper way, if I had misquoted the law in any of the slides that I had put up, or I will put up in a few minutes, you would have heard an objection, and that objection would have been sustained. [¶] Had I ever misrepresented or misquoted the law by saying they are beer ads or meant to present an unbalanced view of the law to you is grossly inaccurate, and I

35

guess an attempt *to just write off the presentation of the law that you got because the defense doesn't have an interest in you having [a] clear, unimpeded view of the law, right? The interest is not for you – to make it easy for you to do your job from that side of the room. The interest is to throw a bunch of things up and see what sticks. Not to take a reasoned, careful approach and a logical approach that makes it clear how to work with the law. Not to their benefit.* Something to think about. [¶] I was also criticized for putting People's 39 up on the board. . . . In the space of six weeks we have condensed five months of investigation and a subsequent three years of litigation, police reports, 137 CDs, 3,000 pages of police reports, 900 pages of Grand Jury transcripts, thousands more pages from prior trials transcripts . . . . To expect you to pick it up without a guide or without at least some kind of roster to know who we are talking about is ridiculous. [¶] Again, *clarity, not something that side of the table wants you to have. . . .*" The prosecutor also discussed defense counsel's criticism of the conduct of certain police officers in the following manner (italicized language is challenged on appeal): "That brings me to the next point I want to address, the defense attorney criticized the job that the San Pablo Police Department did in this case a lot. [¶] . . . [¶] . . . *Criticism of the police to get . . . you [to] take your eye off of the ball, to get you to take your eye off of what really happened, off of the truth*."

### B. Analysis

At the outset we conclude defendant has forfeited his claim of error as he did not object or request an admonition in the trial court regarding the prosecutor's closing remarks in rebuttal. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) Concededly, "[a] failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201 [(*Cole*)].)" (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*).) However, on appeal defendant makes no argument that an objection would have been futile or an appropriate admonition would not have cured any potential harm. Consequently, we deem his claim of error forfeited. (See *People v. Jackson* (2014) 58 Cal.4th 724, 765.) Nor was defense counsel, in effect, "prejudicially

36

deficient for failing to object to the prosecutor's comments because, as will be discussed, there was no misconduct by the prosecutor." (*Cole, supra*, 33 Cal.4th at p. 1202, fn. 11.)

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S. Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S. Ct. 1868].) . . . A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' (*People v. Strickland* ([1974]) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672]; accord, *People v. Farnam* (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].) [¶] When the issue 'focuses on comments made by the prosecutor before the jury, [as in this case], the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on another point in *People v. Hill* [(1998)] 17 Cal.4th 800, 822-823 [(*Hill*)]; accord, *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)" (*Cole*, *supra*, 33 Cal.4th at pp. 1202-1203.)

Here, we conclude the prosecutor's closing remarks in rebuttal did not so infect the trial with unfairness as to deny defendant his Fifth and Fourteenth Amendment rights to due process or involve the use of deceptive or reprehensible methods to attempt to persuade the jury. "Although defendant singles out particular sentences to demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*Cole, supra*, 33 Cal.4th at p. 1203.) "Each of the statements about defense counsel was made in the context of rebutting a statement defense counsel had made during his closing argument." (*Ibid.*) Moreover, the prosecutor did not improperly quote or present a misleading version of the instructions as given by the trial court. "When the comments are considered in context, there is no likelihood that the jury would have understood the

37

comments as anything beyond criticism of defense counsel's tactical approach in argument and the defense view of the evidence in the case, as is allowed. (*People v. Huggins* [(2006)] 38 Cal.4th [175,] 207; [*Cole, supra*, p. 1203].) The comments did not constitute an improper argument or an attack on counsel's personal integrity. (*People v. Chatman* (2006) 38 Cal.4th 344, 387 [42 Cal.Rptr.3d 621, 133 P.3d 534]; *People v. Medina (*1995) 11 Cal.4th 694, 758-759 [47 Cal.Rptr.2d 165, 906 P.2d 2].)" (*Linton, supra*, 56 Cal.4th at p. 1206; see *Cole, supra*, at pp. 1201, 1203-1204 [prosecutor's comments in rebuttal that "defense counsel was attempting to 'mislead,' 'deceive,' or give the 'wrong idea' to, the jury; was 'sneaky'; was 'unfair' to the jury and to the characterization of evidence and the law; and 'wasn't being straight' with the jury," did not constitute improper personal attacks on defense counsel's integrity or otherwise infect trial "with such unfairness as to make the conviction a denial of due process" or "involve 'the use of deceptive or reprehensible methods to attempt to persuade . . . the jury' "].) "We presume the jurors treated 'the comments as words spoken by an advocate in an attempt to persuade' (*People v. Clair, supra*, 2 Cal.4th [at p.] 663, fn. 8), and we find nothing in the record that would suggest otherwise." (*Cole, supra*, at p. 1204, fn. omitted.) Accordingly, defendant's claim of prosecutorial misconduct fails.[21]

## VIII. Cumulative Error

We reject defendant's contention that reversal is required based on the cumulative effect of the purported errors raised on appeal. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*Hill, supra*, 17 Cal.4th at pp. 844-845.) This is not such a case. **"**To the extent we concluded or assumed that the trial court erred, no single error warrant[s] reversal, and we are not persuaded that reversal is warranted when those

---

[21] We are not persuaded by defendant's reliance on *Hill, supra*, 17 Cal.4th at p. 832; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1200; *People v. Thompson* (1988) 45 Cal.3d 86, 112, *People v. Fierro* (1991) 1 Cal.4th 173, 212, and *Cassim v. Allstate Ins. Co*. (2004) 33 Cal.4th 780, 796. Those cases are factually inapposite from this case, and, in all events, do not warrant reversal of defendant's convictions on the ground of prosecutorial misconduct.

same nonprejudicial errors are considered collectively." (*People v. Nelson* (2011) 51 Cal.4th 198, 224-225.)

## IX. Sentences of Life Without The Possibility of Parole

Defendant argues the two consecutive terms of life without the possibility of parole (LWOP) constitutes cruel and/or unusual punishment under the federal and state constitutions[22] because the sentences deny him any chance of parole even if he demonstrates rehabilitation and fitness for release. He asserts the Eighth Amendment precludes mandatory sentences of life without the possibility for parole for juveniles, and then argues that we should apply the same rationale to him, even though he was not a juvenile at the time of the commissions of the crimes, but 18 years and nine months old. He asks us to vacate his sentences and "order appropriate relief," arguing that "before sentencing him to life imprisonment without any possibility of parole," the trial court had an Eighth Amendment duty to consider his youth and immaturity and the real likelihood

---

[22] "The Eighth Amendment of the United States Constitution prohibits infliction of 'cruel *and* unusual punishments.' This prohibition is applicable to the states by virtue of its incorporation in the due process clause of the Fourth Amendment." (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382, fn. 13, italics added.) "The California Constitution prohibits 'cruel *or* unusual punishment.' (Cal. Const., art. I, § 17, italics added.) We construe this provision separately from its counterpart in the federal Constitution. (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 355 [276 Cal. Rptr. 326, 801 P.2d 1077].)" (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1135-1136 (*Cartwright*).) "A punishment may violate the California Constitution although not 'cruel or unusual' in its method, if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal. Rptr. 217, 503 P.2d 921], fn. omitted [(*Lynch*)].) The *Lynch* court identified three techniques courts used to administer this rule. First, they examined the nature of the offense and the offender. (*Id.* at p. 425.) Second, they compared the punishment with the penalty for more serious crimes in the same jurisdiction. (*Id.* at p. 426.) Third, they compared the punishment to the penalty for the same offense in different jurisdictions. (*Id.* at p. 427.)" (*Cartwright, supra*, at pp. 1135-1136.) Although defendant mentions all three techniques, he relies only on the first technique (the nature of the offense and offender), and presents no substantive arguments on the second and third techniques.

he will eventually be rehabilitated and fit to reenter society." We conclude defendant's arguments are unavailing.[23]

Relying on *Miller v. Alabama* (2012) 567 U.S. __ [132 S. Ct. 2455], *Graham v. Florida* (2010) 560 U.S. 48, and *Roper v. Simmons* (2005) 543 U.S. 551, defendant argues the rationale applicable to the sentencing of juveniles should apply to him because he committed the February 2008 murders of Perez and Thayer only nine months after his 18th birthday. However, in adopting a categorical rule barring imposition of the death penalty on any offender under 18 years of age, the United States Supreme Court in *Roper v. Simmons*, *supra*, 543 U.S. 551, explained: "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. . . . [H]owever, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." (*Id.* at p. 574.) "Making an exception for a defendant who committed a crime just [nine] months past his 18th birthday opens the door for the next defendant who is only [ten] months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes and conclude [defendant's] sentence[s] [are] not cruel and/or unusual . . . ." (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [court declined to apply juvenile sentencing principles to 18-year-old defendant who was convicted of first-degree murder, as a principal, rejecting his

---

[23]     At no time in the trial court did defendant object to his sentences on the grounds he now asserts on appeal. To the extent an objection was required to preserve his appellate claims, we have considered his arguments on the merits in light of his contention that his trial counsel was ineffective for failing to object in the trial court. (See *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27 [court considers constitutionality of sentence to " 'forestall a subsequent claim of ineffectiveness of counsel' "].)

argument that he was entitled to relief because the offense was committed five months after his 18th birthday].)

We also reject defendant's argument that the Eighth Amendment precludes mandatory LWOP sentences in his case. Defendant asks us to consider that he was "just" 18 years old at the time of the crimes, he could not be described as a mature adult at that time, and as a matter of developmental, psychological reality, he did not transform from an immature minor to mature adult, when he turned 18 years of age, thereby being rendered incapable of ever being rehabilitated. Defendant concedes the jury found he shot and killed two people, but he asserts he committed those crimes as "an article of faith that every member of the VFL was expected to shoot people believed to be Nortenos," and his situation is "a paradigm case of a violent gang culture leading a troubled, immature, impetuous youth to commit violent crimes." However, none of the mentioned factors render the sentences unconstitutional under either the federal or state Constitutions.

Defendant also argues the imposed sentences violated his constitutional rights because under section 190.2[24] the trial court was required to impose life sentences without parole, and therefore, was precluded from giving any consideration to his immaturity and potential for rehabilitation. However, neither the federal nor state constitution forbids "even the death penalty (and here defendant received the lesser penalty of life imprisonment without parole) (*People v. Loustaunau* (1986) 181 Cal.App.3d 163, 177 [226 Cal.Rptr. 216]) for a person who was not the actual killer and did not actually intend to kill, but who was a major participant in the underlying felony,

---

[24] Section 190.2, provides, in pertinent part, that "[t]he penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] The defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree" or [¶] . . . [¶] "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(3), (22).)

41

acting with reckless indifference to human life." (*People v. Mora* (1995) 39 Cal.App.4th 607, 616, fns. omitted, citing to *Tison v. Arizona* (1987) 481 U.S. 137, 152, 158 [death] and *People v. Purcell* (1993) 18 Cal.App.4th 65, 73, 76 [life without parole], disapproved on another ground in *People v. Estrada* (1995) 11 Cal.4th 568, 579.) [25]

## X.      Section 186.22, Subdivision (b), Gang Enhancements

By its verdicts, the jury found true the allegation that defendant shot both Perez (count 1) and Thayer (count 6) for the benefit of a gang within the meaning of section 186.22, subdivision (b)(1), and also found true the allegation that defendant committed the first degree murders while an active member of a gang within the meaning of section 190.2, subdivision (a)(22). The court sentenced defendant to two consecutive terms of life without the possibility of parole (§ 190.2, subd. (a)(22)) on the convictions for first-degree murder with special circumstances in counts 1 and 6. The court also imposed consecutive determinate 10-year terms for the gang enhancements related to counts 1 and 6 under section 186.22, subdivision (b)(1)(C).

On appeal, the parties agree, and we concur, that the trial court erred by imposing consecutive determinate 10-year terms for the gang enhancements related to counts 1 and 6 under section 186.22, subdivision (b)(1)(C). (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1010-1011 (*Lopez*).) As the court explained in *Lopez*, when a defendant is

---

[25]      We decline defendant's suggestion that we remand the matter for resentencing to allow the trial court to consider his youth and immaturity and the real likelihood he will eventually be rehabilitated and fit to reenter society. "Although largely academic," the trial court explained its sentencing decisions by addressing the circumstances in aggravation and mitigation as outlined in the California Rules of Court. The trial court found, in pertinent part, that defendant and his associates "engaged in a campaign to murder people on the streets of San Pablo for nothing more than wearing clothing of a certain color;" and that defendant's willingness to kill innocent people based on such a trivial reason showed a severe level of depravity. The trial court also found that defendant had sustained several juvenile petitions "of increasing seriousness," he was on probation at the time he committed these crimes, and his performance while on juvenile probation was "consistently unsuccessful," and, "obviously, couldn't be much worse." Were we to remand the matter, we are reasonably certain the trial court would impose the same sentences on defendant's first-degree murder convictions with special circumstances.

42

convicted of a violent felony that is punishable by imprisonment in the state prison for life (such as first-degree murder), paragraph (5) of subdivision (b) of section 186.22 prohibits the court from imposing an additional and consecutive 10-year gang enhancement. (*Lopez, supra*, at pp. 1010-1101; see § 186.22(b)(1)(C), (5)[26].) Accordingly, we shall remand the matter to the trial court with directions to modify the sentence by deleting the 10-year gang enhancements imposed on counts 1 and 6 under section 186.22, subdivision (b)(1)(C).

## DISPOSITION

The matter is remanded to the trial court with directions to modify the sentence by deleting the 10-year gang enhancements imposed on counts 1 and 6 under Penal Code section 186.22, subdivision (b)(1)(C), to prepare an amended abstract of judgment accordingly, and to transmit a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____
Jenkins, J.

We concur:

_____

[26] Section 186.22, subdivision (b), provides, in pertinent part: (1) "Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: [¶] . . . [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years;" and "(5) Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

43

_____
McGuiness, P. J.


_____
Pollak, J.


*People v. Jorge Camacho*, A132875